# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF
# FLORIDA
# TALLAHASSEE

LR

        Plaintiff,

vs.                                                     Case #: 4:19cv349-WS/CAS

LEON COUNTY SCHOOL BOARD;

JAMES "ROCKY" HANNA II, as an Individual and
in his official capacity as Superintendent;
T. ALAN COX, as an individual and in his official
capacity as Assistant Superintendent and Section 504 Officer;
KATHLEEN RODGERS, as an individual and in her
official capacity as Assistant Superintendent and Equity Officer

        Defendants.


## COMPLAINT AND DEMAND FOR DAMAGES

Plaintiff ("LR,") files this complaint against Defendant Leon County School District

("LCS").  This is an action for damages and other relief arising from past and

ongoing deprivation of rights by defendants under color of law of the constitutional

rights to free speech, to be free from retaliation, due process and privacy, and the

right to be free of discrimination, retaliation and interference under the Americans

with Disabilities Act (ADA).

FILED USDC FLND TL
JUL 30 '19 PM 12:05

1

## THE PARTIES

1.  LR is the mother of K. LR, K and his family reside within the boundaries of the educational jurisdiction of the Leon County School District and K is currently enrolled in seventh grade. K has been, since fourth grade, and continues to be, eligible for special education and related services.

2.  K, while not an official party since he is still a minor, is the individual whose life has been most affected by LCS' actions. K is an effusive, kind, social and bright child. He is also greatly frustrated by academics at school. K asks often if he can speak to the tribunal or court because he is concerned about being unfairly portrayed by LCS.

3.  Defendant LEON COUNTY SCHOOL DISTRICT (LCS) is a public entity organized and existing under the laws of the State of Florida, with the capacity to be sued. LCS receives federal funds from the United States Department of Education.

4.  The LCS School Board, as a final policymaking authority under Florida law, Fla. Stat. § 1001.4 is a liable "municipality" under 42 U.S.C. § 1983 ("Section 1983").

5.  Defendant Rocky HANNA is a resident and citizen of Leon County. He is the elected Superintendent of Leon County Schools as a constitutional

educational officer under Article IX Section 5 of the Florida Constitution. The Superintendent is vested by Section 1001.32(3) Florida Statutes with the responsibility of the administration and management of the schools as the Secretary and Executive Officer of the district school board as provided by law.  As a local official HANNA acts under the color of law. Defendant T. Alan COX is a resident and citizen of Leon County and is an Assistant Superintendent of LCS and former Section 504 Officer and as a local official acts under the color of law. Kathleen RODGERS is an Assistant Superintendent and Equity Officer and as a local official acts under color of law.

6.    Because defendants are local officers within the meaning of the law, HANNA, COX, and RODGERS are not eligible for qualified immunity based on their actions and knowledge for purposes of the matters in this case.  Each may be sued in their personal and professional capacities.

7.    LCS, as a public agency, is subject to the provisions of the American with Disabilities Act (ADA).

## JURISDICTION AND VENUE

8.    This is a civil action over which this Court has original jurisdiction.  US 42 U.S.C. § 1983 is a vehicle by which parties can obtain remedies in Federal

Court regarding the deprivation of constitutional and federal rights. The ADA permits claimants to pursue remedies in Federal Court Sec. 42 U.S.C. §12131.

9.    Venue in this Court is proper under 20 U.S.C. § 1391(b) because the defendant, LCS, and its associated agents, are located in Leon County, which is the jurisdiction of this judicial district, and all the events or omissions that are subject of this complaint occurred within the jurisdiction of this judicial district.

10.   The amount in controversy exceeds $75,000.


## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.   Plaintiff has satisfied all conditions precedent to the initiation of this action including but not limited to the timely filing with Division of Administrative Hearings (DOAH) of an Individuals with Disabilities Education Act(IDEA) complaint for the denial of Free Appropriate Public Education (FAPE) on two occasions.  For both matters Plaintiff filed a federal civil action within 90 days of a final order. Additionally, LR has participated or attempted to utilize LCS' internal Section 504 hearing process and FERPA hearing procedures and as otherwise noted in this

complaint. Currently the matters of FAPE are before the court in separate actions.

## SECTION 1983 FRAMEWORK

12.   42 U.S.C. § 1983 (Section 1983) was enacted as Section 1 of the Civil Rights Act of 1871 and can be invoked whenever state or local government officials violate federally guaranteed rights. As a primary means by which a plaintiff may assert a federal civil rights claim for damages against schools and school officials, Section 1983 provides remedies for asserting the rights found in the Constitution.  These remedies include money and punitive damages against individuals.  The language of Section 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

13.   The phrase "every person" excludes states,  but includes state officers acting in their official capacities and local government units. *Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). "Under color of any statute, ordinance, regulation, custom or usage"

5

requires that a school or school officials exercise power "possessed by virtue of state law" or that the defendant is "clothed in the authority of state law." *W. v. Atkins*, 487 U.S. 42, 49 (1988).

14. Section 1983 claims may be invoked for an alleged deprivation of a right, privilege, or immunity secured by the Constitution and laws such as the First Amendment right to free speech, the Fourth Amendment Right to Privacy and the Fourteenth Amendment right to due process.

15. Municipal liability can attach if final policymakers acquiesce to a longstanding practice that constitutes a standard operating procedure. *Monell v. New York City Department of Social Services*. A municipality can be held liable on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority.

## AMERICANS WITH DISABILITIES ACT

16. Under the Americans with Disabilities Act (ADA), a person is qualified as having a disability if they have a physical or mental impairment that substantially limits one or more major life activities, or are a person who has a history or record of such an impairment, or are a person who is

6

*perceived* by others as having such an impairment. (emphasis added).

Americans With Disabilities Act of 1990; 42 U.S.C. § 12102

17.   The ADA prohibits retaliation against any individual who challenges actions under the law or who engages in advocacy to protect the rights afforded by the law to a person with a disability. The law states:

(a) Retaliation - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such *individual made a charge*, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. (emphasis added)

(b) Interference, coercion, or intimidation - It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or *on account of his or her having aided* or encouraged *any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.* (emphasis added) 42 U.S.C. § 12203

# FACTUAL ALLEGATIONS

## I.    General Overview

18.    LR, both directly and through actions taken against K, has been denied her rights through the willful, intentional and malicious actions of LCS beginning approximately five years ago.

19.    The individual and collective actions undertaken by LCS and its associated staff and agents shock the conscience.

20.    Because of the relentless attacks on LR, K and the refusal of LCS for four years to make any good faith attempt to resolve the issues, the family has effectively been forced to leave the State.  LR is a fifth generation Floridian who was raised and schooled in Leon County and she is being compelled to leave work and family behind to try and obtain an education for K and reside in a healthy environment free of retaliation.

## II.    Initiation of the Conflict

21.    As background, LR first sought an evaluation of K for a learning disability in September of 2014 while K attended private school. LCS staff dismissed LR.

22.    LR immediately inquired by email to COX.  Shortly thereafter LR received an unsigned form in the mail regarding the private school meeting which falsely stated LR did not want an evaluation.

23.    LR enrolled K in public school in January of 2015 and requested an evaluation in writing under the IDEA for a suspected disability with regard to written expression.

24.    At the time K had a Section 504 accommodation plan from his previous public school in California although LCS stated "we're not California" when LR inquired about its implementation.

25.    Instead of evaluating K for written expression disorder as the initial suspected disability LCS predetermined his category and only evaluated him for another category, autism.

26.    Although LR was the one who requested the evaluation, LCS ignored LR's input and previous evaluations of K, which LCS knew was against statutory procedures.

27.   LCS had to manipulate score sheets and purposefully utilize an out-of-date state statute to qualify him as a student in the autism category.

28.   LCS then compelled LR to sign paperwork for an autism designation against her wishes under threats to remove her child from class if she did not do so.

29.   LR also asked if K could keep his less intrusive 504 accommodation plan and remain as a general education student.  LCS said no, if she refused ESE status, they would also take away his 504 plan.

30.   Because LCS' practice had been to deny services to dyslexic students, especially those with dysgraphia, a violation of the IDEA in and of itself, LR was made to feel that LCS simply did not want to educate K.

31.   As their anger toward LR grew, LCS used the autism designation to stigmatize him, undermine his confidence, remove him from educational opportunities, upset LR and resulted in the family likely seeking other educational opportunities.

32.   While K and his family have a right to a public education, even if the parents so desired and could afford, K could not, and still cannot, gain admittance to an appropriate private school because specialty schools that focus on dyslexic learners do not accept learners with autism.  This is because the needs of the two groups are so vastly different.

### III.   LCS Refuses to Fix K's Program and Instead Falsifies K's State Compelled Evaluation

33.   LR complained to the Florida Department of Education (FDE) who ordered in May 2016 that LCS evaluate K for a writing disability. This angered LCS and COX especially (see Section IX).

34.   LCS finally undertook the evaluation in January 2017 after much delay and obstruction.

35.   Once again, LCS worked to ensure K did not qualify as having a learning disability (SLD). COX did not want to admit the administrative mistake to the new incoming superintendent. COX was seeking broader responsibilities under the new Superintendent.

36.   COX ultimately was promoted to supervising all school operations across the District, not just ESE.

37.   Even though LCS' own testing placed K at first percentile for spelling (down from 10th percentile in 2015) and he was writing at preschool level, LCS refused to identify his dyslexia based learning disability (SLD) and design a writing program for him.

38.   Cathy Shields, at the time a school speech pathologist for Bucklake Elementary, was assigned by COX to help conduct the falsified evaluation.

Shields violated multiple protocols of a standardized test, including making up a parent interview.

39.   Shields and Bucklake Elementary school psychologist Robert Grandal, also assigned to the evaluation by COX,  then tried to blame a concocted extreme "social impairment" for his spelling and writing problems, and skewed testing results to document and deny a SLD qualification.

40.   Shields and Grandal have continuously told K's teachers that he could write but just chose not to, which was and is a major impediment to K's ability to receiving an education.

## IV.   LCS Fails to Consider Clinical Psychologist's Diagnosis and Recommendations

41.   In May of 2017, after LR sought out and found a local expert, K was privately tested by a licensed clinical psychologist Jennifer Bickell. Dr. Bickell stated K "had the most notable learning disability in written expression that this examiner had ever seen…" and "has been passed on through multiple years of schooling without receiving a diagnosis." She diagnosed him with disorder of written expression, often referred to as dysgraphia, a type of dyslexia.  She noted he was highly social and interactive.

42. LR requested a meeting to consider Bickell's report.

43. LCS's notes show that the psychologist's recommendations and diagnoses were dismissed out of hand by Grandal and Shields, who were brought in to run the meeting at the behest of COX. Shields had at this point been promoted by COX to District ESE Coordinator for Compliance.

44. LCS notes show Grandal once again demurred the dyslexia based category consideration. LCS notes show Grandal blamed both the parent and K for a lack of performance and intervention data. "He has engagement issues, not a writing disability," Grandal stated per LCS notes, adding that K "knows the rules" but "doesn't want to do the work."

45. LR was distraught at having to watch her child struggle and fail only to have Grandal state it was somehow all her child's own fault due to a character flaw and not a learning disability.

46. Dr. Bickell's report observed that autism was not at all evident in this child and the LCS evaluation was far from sufficient to make that determination. But Grandal and Shields, both of whom also personally know K is not a child with autism, dismissed the psychologist's report.

47. As a result, K continued to fail. LR, even with a firm diagnosis in hand, was once again blocked from K's education.

## V.    The Wrong Label Results in the Wrong Services and Accommodations Solidifying the Path to Failure

48.    The wrong label resulted in K becoming functionally illiterate. The wrong label has caused great emotional distress for the family, and directly for K because of the way he was treated by LCS ESE staff.

49.    In fourth grade, upon becoming an ESE student, he was subjected to intrusive, stigmatizing and humiliating actions which did nothing to address his academic issues. He went backwards in his reading STAR test after he became an ESE student. He made 5% scores on spelling tests. LCS gave him toys as their intervention tool, and did not provide academic intervention. In fact, they took away his writing services after only three months, after LR filed the FDE complaint.

50.    A careful reading of the LCS "therapy notes" during the first half or so of sixth grade show that during his intervention sessions K was expected to complete work either way beyond his capabilities with no assistance or work in curriculums that did not address his deficiencies. K was clearly frustrated and discouraged by staff members' negative and critical approach to instruction.

51.    Most of the therapy interventions were "small group." Due to his incorrect identification K was grouped with students primarily diagnosed with

autism who had significant speech and communications challenges. LCS records show at one point K's intervention in sixth grade consisted of playing Candyland with non-verbal children.

52. A review of the sixth grade report card shows K failed most of his classes in the first semester.  Once placed in an online curriculum in math, his engagement in math skyrocketed. Although he earned an A in his final nine weeks in math, in seventh grade he was removed from the online curriculum and as a result, failed his math classes again.

53. By the end of sixth grade K was still at first percentile based on his writing fluency Curriculum Based Monitoring (CBM) and continued to have a six year gap.

54. K's education plan reflects teacher input that shows he is far from an unengaged student. He is described in his IEP records as an "active participant," in verbal discussions, but unable to write and therefore do the work he needs to do to earn passing grades.   He is also noted to "have many friends" and despite his academic challenges, makes consistently good or outstanding citizenship scores.

## VI.   LCS Still Manipulates Educational Records to Hide Their Actions

55.   As the years went on, LCS continued to attempt to hide KR's deficiency and lack of progress by enabling the creation of assessments they know to be inaccurate.

56.   One example, in seventh grade K's language arts teacher submitted an essay written mostly by a peer as a writing fluency sample of K's and then scored it at grade level.  The administrator, Julie Lawson, recorded that score on his IEP even though she knew it was falsified data, causing it to appear on paper that K was a grade level writer.

57.   LR attempted to avail herself of internal LCS procedures to address her concerns. She requested and participated in a FERPA hearing.

58.   It was clear to the attendees at the FERPA hearing that indeed K's records were falsified, but because the hearing officer was an LCS administrative employee, LCS' unstated Board practices prevented her from making findings that would go against the LCS staff.  Instead the hearing officer merely instructed the reader to refer to the original document and did not

make findings as to whether various information was inaccurate or misleading.[1]

## VII.   LCS Finally Acknowledges a Learning Disability after Four Years, But Still Does Nothing to Help K

59.   In September 2018, four full years after they were first notified about concerns and four years after persistent advocacy by LR, LCS designated K as having a learning disability (SLD). However, LCS incredulously made no effort to change or update his program, which clearly was not working.  They wanted to continue to let him fail because the goal was to get him to leave school, not to educate him.

60.   Because of this failure to implement an appropriate program, LR and his family were forced to provide tutoring and transportation at their own personal expense for spelling and writing intervention for seventh grade in lieu of LCS language arts and intervention class.

61.   LR could not manage work and K's tutoring schedule and had to leave her job.  However, not having a job meant the family could no longer afford the tutoring.

---

[1] Prior to the hearing, the Principal removed the peer written assessment score after seeing it, however it was only one of several items listed in the FERPA letter

## VIII. T. Alan Cox, Rocky Hanna and Kathleen Rodgers Retaliate Against LR; K and LR Both Suffer Consequences

62.   LCS administrative leadership have displayed a consistent and malicious pattern of retaliating against LR whenever she attempts to exercise free speech, exercise the right to due process or otherwise advocate for K.

63.   LCS' pattern of retaliation dates back to 2015, when an elementary school principal banned LR from K's school because LR made a complaint about K's school psychological evaluation being left unsecured during parent orientation night.

64.   The principal called LR late in the evening to communicate the ban and was very harsh toward LR.  K witnessed the call.

65.    LR, as pro se litigant, has attached a letter regarding this claim (Exhibit A),  which presents the facts of the ban in an email chain depicting the principal's actions and intent, along with an explanation by an attorney.[2]

66.   Following the issuance of this letter in February 2016 to COX, who at the time was the Section 504 officer responsible for handling disability complaints, LR and K suffered immediate consequences.

67.   Within the next week or so K, a fourth grader, was harshly disciplined for saying an undesired word. He was never informed he was in trouble

---

[2] LR asks that this letter by included as part of this pleading in its entirety since it is written by an attorney and LR is pro se

(or questioned about it at all) and LR was also not informed, a violation of multiple LCS written Board policies.

68.   COX emailed LR confirming he sent "safety and security" to LR's workplace after she unknowingly dropped her son at school when he was supposed to be suspended for saying the offensive word[3].

69.   The presence of "safety and security" staff was witnessed by LR's coworkers, causing LR shock, fear and embarrassment.

70.   LR followed up with defendant RODGERS, the Equity Officer, and asked her to look into the matter.

71.   RODGERS, in an email, told LR K's punishment was overly severe because LR didn't communicate well with the principal, not because of K's actions.

72.   RODGERS' written statement was contrary to Board policies which have specific requirements and protocols that must be met in order to warrant a charge of the nature of the one made against K.

73.   LR then again attempted to utilize more internal mechanisms to raise her concerns. She made numerous requests in writing to COX, the LCS 504 Officer, for a hearing to address the letter and subsequent actions, all of which were ignored or denied.

---

[3] The word was "stripper."

74. LR ultimately requested a hearing in writing to the School Board in June 2016, through the School Board attorney, which was also denied.

## IX.   T. Alan Cox's Memorializes His Intent to Deny LR's Rights – "Shut her down"

75. In May 2016, after repeatedly denying LR's request for a hearing, COX sent an email to K's teachers and administrators criticizing LR and telling them he would "shut her down" referring to LR.

76. COX's email depicting his animosity and anger toward LR came mere days after FDE made its findings of non compliance and right before a state ordered IEP meeting.

## X.   Rodgers and Cox Further Efforts to Drive the Family From Public School

77. After failing to secure a hearing, LR submitted a formal complaint to the US Department of Education Office of Civil Rights (OCR) in early August 2016 alleging ADA and 504 violations including retaliation.

78. In August of 2016, after the OCR complaint was filed, COX once again dismissed LR, this time by rejecting multiple written requests for an IEP meeting to discuss K's educational placement at the start of school.

79. Instead on August 26, 2016 RODGERS instructed the principal to de-enroll K over LR's protests, a violation of multiple written LCS Board policies and state law.

80. COX continued to obstruct and delay an IEP meeting for K until the last day of September.

81. In October, mindful of statute of limitations, LR was forced as a last resort to due process under the IDEA and filed a complaint and request for the first hearing.

82. Later in the Fall COX had his staff take actions to delay K's enrollment back into public school for the upcoming the second semester. This proved an insurmountable challenge for K.

83. Despite COX's actions to prevent K from re-enrolling second semester and RODGERS' previous action of de-enrolling him in the first semester, COX berated LR in front of others for not "sending her child to school."

84. At one point COX's harsh rebukes during a call she took from him at work brought her to tears, which was witnessed by her co-workers. COX told LR, "I will see you in court."

85. In April 2017 COX once again memorialized his retaliation in writing. COX sent a letter telling LR that her right to participate in and contribute to her son's IEP was denied because she had filed a due process complaint. Yet at the same time COX had the team hold an IEP meeting

without LR's permission or participation. This was done to demonstrate to LR COX's absolute power over K's education.

# XI.   Obstruction of Due Process - The First IDEA Administrative Hearing 2017

86.   Prior to and during the first Due Process hearing in summer of 2017, COX oversaw legal preparation, witness coaching, records compilation and served as corporate representative for the hearing[4].

87.   During the hearing evidence in the record shows teachers blatantly perjured themselves regarding the creation of written records. Further, many of K's educational records were created or manipulated solely to support the LCS due process defense, which at this point was approaching a six figure sum in legal fees, an unusually high amount.

88.   One such record that was created was done to attack K directly and falsely portray him as a disturbed and violent child. This record was written by a fellow student who has the initials KH.

89.   This record was never shared at any meetings or shown to LR until 5 days prior to the hearing even though by this time it was supposedly

---

[4] This hearing is addressed in related case 4:18-cv-72

almost two years old. The student's name was not redacted in the version given to LR and LR knew that this student had apologized to K in the past for something she had done to hurt him.

90.   It turns out the violent and disturbing words she attributed to K did not come from him, and that she had written the document at the behest of school administrators. One of her parents had been in and out of prisons in Georgia and Florida for years for violent crimes. The words she attributed to K were similar to a prison scene.

91.   LCS submitted KH's written document and had it included in the record as a smear tactic against K even after LR had addressed its questioned authenticity with the school board attorney. Its inflammatory nature was so great it would damage K irrevocably and upset LR greatly.

92.   COX testified at the hearing as the corporate representative. He made misrepresentations under oath in conflict with LCS' own documentation regarding decisions made at an IEP meeting.

93.   Additionally COX testified under oath that LR was "crazy." [5]

94.   Just prior to the proceedings LCS made a last minute records dump before the exhibit submission deadline.

95.   LR had requested about a half dozen emails with very specific parameters, dates and names that would be considered K's personal

---

[5] Cox is sometimes referred to as Dr. Cox due to his PhD in physical education. There is no evidence he has medical training or authority to make a mental health diagnosis.

educational records.  After a delay attributed to a "server crash" LCS sent a usb thumb drive with literally thousands of email records, some dating prior to K's birth.

96.    These email records ranged from retirement party planning to pages of spam to an audit of personal data on all LCS students who had either an IEP of EP (gifted) for the year 2010.  Data included unredacted birthdays, student numbers, class schedules, addresses and disability notations for over 6,000 students.

97.    The thumb drive also contained psychological and medical records for certain students and IEPs, none of which had the names redacted.[6]

98.    Because of the delay and massive volume of emails, LR was unable to prepare adequately for the due process hearing.

99.    The school board attorney then criticized LR's ability to represent K in the due process hearing in a lengthy email that was cc'd to her law partner. This made LR feel inadequate in her ability to represent K at the hearing.

100.   The school board attorney also repeatedly sent personally insulting emails to LR that are outside the boundaries of "fierce litigation." Many were filled with all caps (shouting). Again LR felt demeaned by these actions.

---

[6] LR suggested Hanna and the School Board, through the school board attorney, notify the individuals affected; they refused

101.  The school board attorney took advantage of LR's pro se status by allowing discovery to proceed even though she knew or should have known it was not permitted in IDEA hearings.[7] She sent interrogatories in an attempt to gain knowledge of K's mental health history and use it against him.

102.  Since K has no mental health diagnosis or history, she did not find anything useful.

### XII.  HANNA Gets Involved

103.  LR reported LCS' due process transgressions to HANNA in October 2017, including showing him samples of the personal student data. Shortly after, K was again subjected to an unfounded suspension and related threatened arrest out of the blue, despite good to excellent citizenship scores.

104.  HANNA also sent LR a hostile and intimidating email on Nov. 27, 2017 chastising her for various things, one of which was "demonizing" his staff. LR had been careful not to characterize the actions of his staff as bad or evil, and instead presented documents she collected in a binder

---

[7] Letter from Matthew Mears to Robert Cohen, Chief Judge, DOAH, February 8, 2016

and a letter outlining concerns.  It was HANNA's own mindset that led him to utilize that language, not LR's at the time.

105.  In the email, HANNA blamed LR for a range of problems including the fact he authorized "spending tens of thousands of taxpayer dollars trying to satisfy your requests" when in actuality that money, drawn from the "general" fund, was paid to the attorneys and legal consultants to fight LR in the due process hearing. HANNA was placing the blame for LCS' unreasonable financial actions and the retaliation the family experienced squarely on LR's shoulders.

106.  HANNA wrote the email fully aware of COX's actions and motivations, and instead of stepping in and putting a halt to this behavior, as evidenced by the email, he joined in COX's effort to "shut her down".

107.  LR was distraught at HANNA's email which also stated "Long ago you made the conscious decision to pursue your efforts through a court of law." In fact, LR had yet to purposely file any court cases regarding the matter (or any other matter) other than the IDEA due process administrative complaint, and only then when the statute of limitations was imminent and LR had no other option.

108.  It turns out in April 2016, unbeknownst to LR and without her approval or an attorney-client agreement, a state whistleblower case had been filed in LR's name against the previous superintendent and LCS.

109. The attorney who filed the complaint was HANNA's attorney and was supporting him in his election campaign. She filed multiple whistleblower complaints which helped to paint his opponent as corrupt.

110. At some point about a year later LR learned of the case.

111. LR had followed up with this attorney in October 2017 upon the suspension and threatened arrest that came immediately after her meeting with HANNA. LR requested the attorney consider adding an ADA/504 retaliation claim or if too busy, refer her case to another attorney.

112. Right around and after the time HANNA sent the hostile email to LR, in December, the attorney instead withdrew LR's whistleblower case voluntarily with prejudice without consulting or informing LR that she had done so.[8],[9]

113. LR suffered emotional distress when she realized she had been used as an unknowing pawn to assist HANNA in his campaign, but then when it was convenient, HANNA held the litigation against her. The fact that the whistleblower case was made to go away in such a highly unusual fashion and the suspect timing of a voluntary dismissal with prejudice creates further concerns for LR.

---

[8] The attorney does not deny filing or dismissing the case without LR's permission and knowledge per a letter she sent to the Florida Bar.

[9] LR found out it was dismissed by looking up the case on the docket after she heard no response from the attorney.

114.   The uncertainty as to whether HANNA worked with his attorney to
       remove the case is something by which LR will always be bothered.

115.   The attorney never explained her reason to LR.

### XIII.   LR Asks for a Reprieve but LCS Increases Pressure to Force K Out

116.   In May 2018, LR submitted a detailed letter to the HR Director about the ongoing actions of LCS ESE staff, the emotional toll it was taking on her family, the impact it was having on her work and pleaded for them to stop.[10] When no reply was provided, LR requested the letter be sent to the Board and included the school board attorney in that request.

117.   The letter was still ignored and dismissed. The school board attorney offered bureaucratic roadblocks as reasons for denial even though Board policy allowed complaints to be forwarded to the Board.

118.   The HR Director stated under oath that she sent the letter to COX to handle. Martha Fletcher, former ESE Director, stated under oath that the letter and its concerns were sent to Julie Lawson to address and resolve. But LR never received any response, and instead the mistreatment escalated.

119.   In August 2018 LR attended a resolution meeting as part of a second due process case and to plan for seventh grade. LR brought a family friend

---

[10] Letter to Mary Nicholson, May 28, 2018

who happened to be an attorney.[11] LR thought bringing a mutually respected third party might be able to help resolve the issues.

120.   LR's family friend suggested to the school board attorney that regardless of past issues, the focus should be on the needs of the child and trying to put together a program to help K moving forward. Yet in response, LCS, through K's school administrator for ESE Julie Lawson under the direction of COX, took an even more aggressive stance to drive K and LR out of the public school system.

121.   COX knew, in his capacity as head of school operations, that multiple retaliation complaints and grievances had been lodged against Lawson by individuals associated with the school system.  These grievances included allegations she retaliated against teachers and staff who advocated for children with IEPs.

122.   In September 2018 Lawson began retaliating against LR by defaming her in front of her child to another teacher referring to LR as "crazy" while K was sitting in Lawson's presence.

123.   The stress caused by LCS began taking a physical toll on LR who for the first time since childhood was forced to visit the emergency room after experiencing symptoms of a stroke.

---

[11] LR clearly stated this individual was not acting in a legal capacity and was not LR or K's lawyer.

124. In October 2018 Lawson targeted K, and subjected him to public humiliation and shaming so severe that he refused to attend school for two weeks out of fear of Lawson, causing LR to miss work.

125. Among other things, Lawson falsely depicted K as having mental problems in front of staff members and others in a public cafeteria while he was sitting quietly, profoundly embarrassed and ashamed.

126. Lawson continued to demean K publicly when given the opportunity even after the principal of the school attempted to intervene at LR's request. She sabotaged efforts to move K to an online curriculum for math and spread lies about his absences.

127. In April 2019 COX made public comments to a media outlet about this matter, putting forth mischaracterizations[12],[13],[14] and apparently revealing LR's name to the reporter. LR never spoke with this media outlet about this matter and first found out about the article from a teacher at K's school. LR was very upset by COX's public comments.

128. The nature COX's public comments had nothing to do with the well-being or the quality of education for K, but centered around LCS' resolve to fight LR and to portray her as a loser.

129. In May 2019 K's IEP team decided he needed summer tutoring. When Cathy Shields, who by now had been promoted by COX to Director of

---

[12] Tallahassee Democrat, April 4, 2019, *LCS Denied Proper Disability Services, Retaliated Against Mother*
[13] LR has never given COX permission to disclose information about K or his family.
[14] LCS had not been served with the complaint at the time

ESE for LCS, was made aware, she attempted to block K's services. She

directed staff to hold an IEP meeting without LR's knowledge and

participation in an effort to retract what the team had decided.

130.   As noted LR ultimately had to leave her job to manage the consequences

of LCS actions and she and her husband have to weigh her health against

K's education.  K still cannot write, he essentially failed seventh grade

and LR still suffers ongoing punishment for advocating. There is no end

in sight. Given the vitriol LCS has for LR, and the refusal to even

consider multiple attempts and avenues of resolution, there is no reason

to believe an amicable resolution in the interest of the child is possible.

## XIII.  LCS Discriminates Against LR in Violation of the Americans with Disabilities Act (ADA)

131.   Per paragraph 93 COX under oath declared LR had a disability, declaring

her "crazy," an inartful term that nevertheless implies a mental disability of

some sort which would suggest she is incompetent.  While LR does not

have a disability and has never been diagnosed with any type of mental

condition, COX caused her to be *perceived* as such.

132.   As stated in paragraph 121 COX later recruited Lawson to retaliate against

LR. Lawson, at the direction of COX, also told various individuals LR was

"crazy." This reflects a pattern whereby when LR tried to advocate for K,

LCS put forth the false perception that LR had a mental disability so that her claims would not be taken seriously.

## STATEMENT OF CLAIMS – REQUEST FOR DAMAGES AND TRIAL

### COUNT 1: CAUSE OF ACTION AGAINST DEFENDANTS JAMES ROCKY HANNA II, T. ALAN COX, KATHLEEN RODGERS and LEON COUNTY SCHOOL BOARD FOR DENIAL OF CONSTITUTIONAL RIGHT TO FREE SPEECH UNDER COLOR OF STATE LAW ARISING IN VIOLATION OF TITLE 42 UNITED STATES CODE §1983

**1.1.** Plaintiff realleges paragraphs 1-132 inclusive as if fully set forth herein verbatim and further alleges

1.2. This is an action for damages against Defendants HANNA, COX and RODGERS individually and as Superintendent and Assistant Superintendents of Leon County, Florida School Board and LCS for denial of Plaintiff's Constitutional Rights under Color of State Law to free speech and to be free of retaliation arising from LR's advocacy in violation of Title 42 United States Code §1983.

1.3. LCS and COX violated LR's constitutional and federal rights by forcing her to sign and ratify that her son was autistic in order for him to be allowed to attend school.

1.4.   COX and LCS violated LR's constitutional and federal rights with malice as evidenced by his actions to defame her and his declaration that he would "shut her down" when she exercised her right to advocate for her child.

1.5.   COX and LCS violated LR's constitutional and federal rights by engaging in a pattern of retaliation when LR exercised her right to advocacy for her child including by defamation, denial of participation, and intentional infliction of emotional distress. Further, COX undertook efforts to engage his subordinate LCS staff to participate in these actions.

1.6.   A reasonable public official in COX's place, considering his role as Section 504 Officer, and LCS could not have believed that retaliating against LR did not violate First Amendment law. Therefore COX should not receive qualified immunity.

1.7.   RODGERS and LCS violated LR's constitutional and federal rights to free speech when she de-enrolled K due as a direct and proximate result of LR's filing a complaint with her about K's treatment and for filing a complaint with OCR.

1.8.   A reasonable public official in RODGERS's place, considering her role as Equity Officer, and LCS could not have believed that retaliating against LR did not violate First Amendment law.  Therefore Rodgers should not receive qualified immunity.

1.9.   HANNA as COX's supervisor was fully aware of COX's actions to deny LR's rights and retaliate against her, and did nothing to stop those actions.

1.10.   HANNA, as Superintendent, violated LR's constitutional and federal rights by using his authority to send intimidating emails to LR in an effort to stop her from advocating for her child and in support of COX's actions.

1.11.   A reasonable public official in HANNA's place, in consideration of his role as Superintendent, chief executive and policy maker of LCS should have known his actions violated LR's rights and should not receive qualified immunity.

1.12.   As a direct and proximate result of the denial of constitutional rights Plaintiff LR has suffered physical and emotional injury, anguish, loss of reputation and humiliation, embarrassment, mental and emotional distress, loss of self-esteem, harm to personal and business reputation. These damages have occurred in the past and can reasonably be expected to be incurred in the future.

1.13.   It serves the public interest that a citizen be able to exercise their constitutional rights through the right to file a grievance and protest unfair treatment.

1.14.   All of the above was known to the LCS municipal board through the school board attorney.

## COUNT 2: CAUSE OF ACTION AGAINST DEFENDANTS JAMES ROCKY HANNA II, T. ALAN COX, KATHLEEN RODGERS and LEON COUNTY SCHOOL BOARD FOR DENIAL OF CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER COLOR OF STATE LAW ARISING IN VIOLATION OF TITLE 42 UNITED STATES CODE §1983

2.1     Plaintiff realleges paragraphs 1-132 inclusive as if fully set forth herein verbatim and further alleges

2.2     This is an action for damages against Defendants HANNA, COX and RODGERS individually and as Superintendent and Assistant Superintendents of Leon County, Florida School Board and LCS for denial of Plaintiff's Constitutional Rights under Color of State Law to due process arising from LR's advocacy in violation of Title 42 United States Code §1983.

2.3     LCS violated LR's constitutional and federal rights to due process and her right to participate in her child's education when it banned LR from her son's school because she attempted to report a violation.

2.4     COX and LCS violated LR's constitutional right to due process by using his position and authority to obstruct and impede LR's ability to participate in an IDEA due process hearing. LCS, through HANNA, were aware of COX'S actions, and thus complicit in the obstruction.

2.5     COX and LCS violated LR's constitutional rights by using his authority as Section 504 officer to deny LR's due process rights, including a right to make

a complaint and air grievances at a hearing. LCS was aware of this action through its school board attorney, and complicit in the denial.

2.6     RODGERS and LCS violated LR's constitutional right to due process by failing to follow Board policies during her investigation into K's removal from school.

2.7     RODGERS and LCS violated LR's constitutional right to due process rights by de-enrolling K from school with no notice and against policy in direct and proximate result of LR filing an OCR complaint.

2.8     COX and HANNA and LCS violated LR's Constitutional rights by punishing LR for bringing a due process claim under the IDEA through joint and separate acts of intimidation and denial of participation in K's education.

2.9     HANNA, COX and LCS through its school board attorney violated LR's constitutional rights by purposely impeding LR's ability to obtain counsel.

2.10   LR restates 1.6, 1.8 and 1.11 and 1.13 for purposes of this count.

2.11   As a direct and proximate result of the denial of constitutional rights Plaintiff LR has suffered emotional distress, physical injury, loss of reputation and humiliation, embarrassment, mental distress and anguish, loss of self-esteem, harm to personal and business reputation. These damages have occurred in the past and can reasonably be expected to be incurred in the future.

## COUNT 3: CAUSE OF ACTION AGAINST DEFENDANTS LEON COUNTY SCHOOL BOARD FOR DENIAL OF CONSTITUTIONAL RIGHT ARISING FROM A STANDARD OPERATING PRACTICE BY A MUNICIPALITY ARISING IN VIOLATION OF TITLE 42 UNITED STATES CODE §1983

3.1.   Plaintiff realleges paragraphs 1-132 inclusive as if fully set forth herein verbatim and further alleges

3.2.   LCS as a municipality has maintained customs and practices to violate LR's constitutional and federal rights.

3.3   LCS has violated LR's rights by engaging in a longstanding standard operating practice of ignoring written Board policies and laws. This pattern or practice served to eliminate protections and prevent the implementation of internal procedures for aggrieved parties, including LR, to pursue when they believe their rights have been violated.

3.4   LCS has violated LR's rights by engaging in an unwritten standard operating practice of denying certain disability categories for its students, namely those related to dyslexia.

3.5   Access to internal grievance mechanisms as provided in written policies and access to disability services for students with dyslexia are both matters of public interest.

**COUNT 4 :CAUSE OF ACTION AGAINST DEFENDANTS JAMES ROCKY HANNA II, T. ALAN COX and LEON COUNTY SCHOOL BOARD FOR DENIAL OF CONSTITUTIONAL RIGHT THROUGH NEGLIGENT HIRING ARISING UNDER COLOR OF STATE LAW IN VIOLATION OF TITLE 42 UNITED STATES CODE §1983**

4.1.   Plaintiff realleges paragraphs 1-132 inclusive as if fully set forth herein verbatim and further alleges

**4.2**   This is an action for damages against Defendants HANNA, COX individually and as Superintendent and Assistant Superintendent of Leon County, Florida School Board and LCS for denial of Plaintiff's Constitutional Rights under Color of State Law through negligent hiring in violation of Title 42 United States Code §1983.

4.3   COX, HANNA and LCS promoted Shields continuously as she actively denied LR's rights and participated in falsifying K's educational records.

4.4   HANNA, hired and supervises COX. HANNA is fully aware and supportive of COX in his actions against LR.

4.5   HANNA through his budgetary authority has authorized an excessive use of legal fees to support COX's efforts against LR.

4.6   LR restates 1.6, 1.11 and 1.13 for purposes of this count

4.7   As a direct and proximate result of the denial of constitutional rights Plaintiff LR has suffered emotional distress, physical injury, loss of reputation and

humiliation, embarrassment, mental distress and anguish, loss of self-esteem,

harm to personal and business reputation. These damages have occurred in

the past and can reasonably be expected to be incurred in the future.

**COUNT 5: CAUSE OF ACTION AGAINST DEFENDANTS T. ALAN COX
and LEON COUNTY SCHOOL BOARD FOR DENIAL OF
CONSTITUTIONAL RIGHT TO PRIVACY ARISING UNDER COLOR OF
STATE LAW IN VIOLATION OF TITLE 42 UNITED STATES CODE
§1983**

5.1.   Plaintiff realleges paragraphs 1-132 inclusive as if fully set forth herein

verbatim and further alleges

**5.2**   This is an action for damages against Defendants COX individually and as

Assistant Superintendent of Leon County, Florida School Board and LCS for

denial of Plaintiff's Constitutional Rights under Color of State Law to privacy

in violation of Title 42 United States Code §1983.

5.3   COX and the LCS have violated LR's right to privacy by not protecting the

integrity of K's educational records.

5.4   LCS and COX have violated LR's privacy by discussing this matter with

members of the community and the media.

5.5   LR restates 1.6 and 1.13 for purposes of this count.

5.6   As a direct and proximate result of the denial of constitutional rights Plaintiff

LR has suffered emotional distress, physical injury, loss of reputation and

humiliation, embarrassment, mental distress and anguish, loss of self-esteem, harm to personal and business reputation. These damages have occurred in the past and can reasonably be expected to be incurred in the future.

WHEREFORE, Plaintiff prays that the court will for all Counts 1-5:

A.   Take jurisdiction of the parties and subject matter of this action;

B.   Deny Pre-answer Qualified Immunity to Defendants HANNA, COX and RODGERS;

C.   Conduct a Trial on all issues triable of right;

D.   Following a favorable verdict for Plaintiff, enter Final Judgment for damages, stigma, loss of income, loss of abode, loss of attorney's fees and costs, loss of reputation and career, physical injury, humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, harm to personal and business reputation in favor of the Plaintiff;

E.   Enter such other and further relief as the court deems just in the premises.

PLAINTIFF DEMANDS TRIAL OF ALL ISSUES TRIABLE OF RIGHT.

## STATEMENT OF CLAIMS - ADA

## COUNT 6: LEON COUNTY SCHOOL BOARD DISCRIMINATED AGAINST LR IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

6.1.  Plaintiff realleges paragraphs 1-132 inclusive as if fully set forth herein verbatim and further alleges

6.2.  This is an action for damages against LCS for discrimination against LR in violation of 42 U.S.C. § 12102 (3) and Sec. 12132.

6.3   LCS, COX violated LR's rights under the ADA by discriminating against and encouraging others to discriminate against LR for a disability she was perceived to have.

6.4   COX violated LR's rights under the ADA by creating and perpetrating the perception of the disability in order to attack LR's credibility.

## COUNT 7: LEON COUNTY SCHOOL BOARD DISCRIMINATED AGAINST LR IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT THROUGH INTERFERENCE AND RETALIATION FOR ADVOCATING FOR A PERSON WITH A DISABILITY

7.1.  Plaintiff realleges paragraphs 1-132 inclusive as if fully set forth herein verbatim and further alleges

7.2. This is an action for damages against LCS for retaliation, interference and intimidation directed at LR when she advocated for her son in violation of 42 U.S.C. § Sec. 12203 (a) and (b). LR is seeking remedies as provided under § Sec. 12203 (c).

7.3 LCS, COX and HANNA violated LR's rights by pattern and practice of retaliation to interfere with and intimidate LR for her efforts to aid a person with a disability.

WHEREFORE, Plaintiff prays that the court will for Counts 6-7:

A. Take jurisdiction of the parties and subject matter of this action;

B. Conduct a Trial on all issues triable of right;

C. Following a favorable jury verdict for Plaintiff, enter Final Judgment for damages, stigma, loss of income, loss of abode, loss of attorney's fees and costs, loss of reputation and career, physical injury, humiliation, embarrassment, mental and emotional distress and anguish, loss of self-esteem, harm to personal and business reputation in favor of the Plaintiff;

D. Enter such other and further relief as the court deems just in the premises.

PLAINTIFF DEMANDS TRIAL OF ALL ISSUES TRIABLE OF RIGHT.

Dated: July 30, 2019

Respectfully submitted,

LR
1552 Copperfield Circle
Tallahassee, FL 32312

# EXHIBIT A



**James H. K. Bruner, Sr.**
**Attorney and Counselor at**
**Law 902 North Gadsden Street**
**Tallahassee, Florida 32303**
**(850) 228-4227**
**james@jamesbrunerlaw.com**

www.jamesbruner.attorney          Florida, New York, Massachusetts, and Maine

February 12, 2016

T. Alan Cox, Div. Director, Professional Standards
Leon County Schools
2757 W. Pensacola Street
Tallahassee, FL 32304          Re: **Pattern of Retaliation against a Family**

Dear Dr. Cox,

I have been asked to help a family in the district bring to your attention a disturbing set of circumstances that has every appearance of being retaliation by school administrators against the parents and the child for the family's exercising of rights to be involved in the establishment of the proper educational services under federal and Florida law. This letter serves as notice to the district regarding this family's plight and is written at your suggestion to one of the parents.

According to my clients, they do not feel the District is aware of the retaliation, resistance, and hostility that occurs when a parent tries to exercise their right to participate in the schools findings and recommendations pertaining to their child. My clients are hopeful of working with the district to quell the hostility and retribution being observed within the school.

## I. The Law

- *Title VI -- 34 CFR 100.7(e): "Intimidatory or retaliatory acts prohibited. No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder."*
- *Title IX -- 34 CFR 106.71 (uses retaliation language under Title VI)*

- *Section 504 of the Rehabilitation Act of 1973 -- 34 CFR 104.61 (incorporates the retaliation language of the regulations under Title VI)*
- *Title II of the Americans with Disabilities Act -- 28 CFR 35.134: "(a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part. (b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part."*

## II. The Facts

As but one concrete example, I enclose a redacted copy of an email trail between the parent and School Principal.

In the exchange, the parent advises of right to recess under 504 Plan and right to have a Parent–Teacher Conference (PTC) which has been withheld by Principal. **See Exhibit A.**

### ---Shun On---

Principal admits barring parent from campus for the PTC (and any other reason a parent would want to experience of their child's education) due to the parent not returning a child's record. Actually the parent was escorted off campus. Principal admits having the knowledge that the PTC has been requested by the teacher as well, i.e. it is critical to the child.  **See Exhibit B.**

Parent explains that the record had long been returned. **See Exhibit C.**

### ---Shun Off---

The Principal apologizes for the delay ***and allows the parent to come on campus again.*** **See Exhibit D**

It is worth noting here that while the Principal is lifting the ban, albeit delayed,

the Principal has denied a child and his parent access to one another at any school function for months out of retaliation over a disputed copy of a record in the possession of the parent. As odd as that seems, it gets worse.

The parent responds to the Principal's email (**Exhibit D**) by explaining the misunderstanding regarding the record. She actually explains how the record should have never been in plain sight on a Parent's Night and how she brought it to administrators' attentions without out any assistance. In short, she informs the Principal how she secured the record and how the school may have been in violation of FERPA. **See Exhibit E.**

### ---Shun On---

Because the parent merely explained the reason the record was handled in the manner it was, the Principal unilaterally reinstates the shunning and restores the ban of the parent of being able to be with her child for any school event. In short, the principal indicates that because the parent is not going along with the school's version of events, 'you lose and your child loses.' He states, "*At this time I revoke your ability to visit campus without my authorization.*" **See Exhibit F.**

I believe this conduct violates Florida and Federal law and there is more.

**Retaliation against Child if Parent Doesn't Attend an Eligibility Meeting**

On September 11, 2015 the Principal informed the parent that if she did not attend an IDEA eligibility meeting that the child "won't be in class." As promised the suspensions and detentions began in earnest after that point.

**Predetermining Placement**

On September 11, 2015 the parent brought up recess and the 504 plan. The principal told the parent if the student needed exercise he belonged in the resource room. He also said if the child didn't like being taken out of class to the resource room (which the parent had stated) that "he needed to take his medicine." In October the child was notified by another classmate that he was to be placed in the resource room even though an IEP meeting had yet to take place. That child, an ESOL learner, did not like being placed in the resource room with moderately to severely disabled children.

**Excessive Punishment and Punishment of Manifestation of the Disability**

While the parent is engaging school administrators regarding an accurate assessment of the child's needs, which, per above, is met with incredible resistance (as if the parent does not know the child's needs), the school starts excessively punishing the child for behaviors that are frequently observed throughout the school's student community.

The child is not only held to a double standard as compared to other students in the general education environment, but has been singled out due to a perceived disability.

In addition, the behaviors could be deemed as manifestations of the identified disability and/or they occur as a direct lack of adherence to the student's 504 plan. The timing of these punishments is suspect as they occur directly after the parent raises concerns under federal and state statutes.

**Hostile Educational Environment**

The guidance counselor for this family (who was not certified for the position) was apparently upset over the parent's objection to the evaluation's conclusions. The parent had suggested the evaluation was influenced by inaccurate and misleading information in a previously discredited report. The counselor's anger leaked out when he aggressively made demeaning statements about the student to the parent in the student's presence. Watching his parent being treated in this fashion combined with the severe attack to his character has devastated the student and caused him to distrust school officials.

The speech therapist at the new school as part of "social skills training" told the child in his first session that "he had problems." When the child asked why the speech therapist had been rude to the parent she stated "none of your business." The principal of the new school refused to hold a meeting with the parent and the speech therapist to discuss the session and finally removed the speech therapist after the parent sent a barrage of emails to her, the teachers and District personnel.

The extent of this mistreatment combined with the suspensions or "all day detentions" (whichever category is best for school reporting purposes) has resulted in the child losing the opportunity to learn and participate meaningfully at school.

4

**Maintaining Inaccurate Records**

None of the detentions or suspensions were entered on the parent portal, yet they were cited as a basis for subsequent school disciplinary action the second week after the child transferred to a new school.  It is unclear how and if they were reported to monitoring agencies.

**Continued Retaliation at the New School**

The parent is concerned that records and conversations by school administrators have "poisoned the well" and have made it impossible for the child to get an appropriate education in this district that adheres to privacy safeguards, is free of disparate treatment and allows parent participation. In addition to items cited above, just yesterday the parent was called out of a meeting at work because the child had said "the Hunchback of Notre Dammit" in class.  This happened the day after the parent requested records and a hearing to challenge three disciplinary write ups in the educators' handbook.

There have been cumulative incidences, usually happening in conjunction with the parent asserting rights under IDEA or FERPA, where the child has been given wrong grades, excluded from activities and been subject to demeaning, unsolicited comments by adults at the school. The child continues to be a target at the new school, the parent is frozen out and the family is not being afforded rights under the IDEA.

It is sincerely hoped that by bringing these facts to your attention, the parents can work with you and your designees to protect the child and parents from further retaliation within the school.  This letter simply serves to provide you with notice of the conditions. All further communications are to be conducted with the parents directly.

Very truly yours,

James H. K. Bruner, Esq.

c.c. Opal McKinney-Williams, Esq.

**From:** ⟨                [mailto                  mail.com]
**Sent:** Monday, October 26, 2015 8:52 AM
**To:** Bottini, Shannon
**Cc:** Solz, David
**Subject:** Re: Friday Folder-Note

Thanks mrs. Bottini. Just to be clear, his 504 plan, which is a federal law, states recess (preferred activity) cannot be taken away no matter what the reason.

If one of the over six requests I made to have a meeting would have been granted, or if we would have been permitted to have a parent teacher conference as required under Florida education regulations this could have been handled more pleasantly with a simple conversation.

I am sorry you are in the middle of this situation. I know it is very difficult for you, I assure you it has been far more difficult for me and ⟨

Hopefully a transfer will be granted soon.



On Oct 26, 2015, at 11:10 AM, Solz, David <SOLZD@leonschools.net> wrote:

Good Morning Ms

I would be happy to permit your return to campus, however, I have not received the document that you agreed to return from Ms. Bottini's files. You assured me during our meeting in September that you would return the document by the end of the week. Have you returned the document that you removed from Ms. Bottini's files? Again, I will be happy to allow you back on campus as a visitor once this document id returned. I know Ms. Bottini is anxious to meet with you for a conference. Of course a phone conference is allowable or a face-to-face conference supervised by one of our administrative staff can be arranged as well.

Thanks,

**David Solz, Principal**

**Gilchrist Elementary School**



**From:**  [mailto.____ _gmail.com]
**Sent:** Monday, October 26, 2015 11:17 AM
**To:** Solz, David
**Subject:** Re: Friday Folder-Note

I returned the documents a long time ago. I placed them in an envelope, taped it up and wrote records - confidential on the envelope. I left them at the front desk - this was over a month ago.

Also, none of the documents were original records, only copies.

Regards,

Sent from my iPhone

EXHIBIT

C

ALL-STATE LEGAL®

Gmail - Friday Folder-Note                                        11/3/16, 10:12 AM



---

## Friday Folder-Note

---

**Solz, David** <SOLZD@leonschools.net>                    Mon, Oct 26, 2015 at 11:20 AM
To: ⟨              ⟩com>
Cc: "Bottini, Shannon" <bottinis@leonschools.net>

Thank you for letting me know.  I apologize for the delay.  I will let Ms. Bottini know she can set up the conference as soon as possible.


# David Solz, Principal

# Gilchrist Elementary School



David Solz
**0381**
73001-Principal General - Elem.

487-4310 Work
(850) 487-0959 Fax
solzd@leonschools.net

1301 Timberlane Road
Tallahassee, FL 32312



**From:**             '.com]
**Sent:** Monday, October 26, 2015 11:29 AM
**To:** Solz, David
**Subject:** Re: Friday Folder-Note

Also, just to clarify, I did not "remove documents from mrs. Bottini files" - they were in an open folder on a table that she had directed us to look at to see our children's work. A psychological evaluation was in there with a binder clip and no envelope. Because any parent or child could easily access these very confidential documents that should be kept under lock and key by your guidance office, I immediately removed them in an attempt to secure them so that the school would not be liable should someone inadvertently access them and violate    privacy. I approached mrs. George and she said she did not know anything about them and did not offer to take them. Mrs bottini was surrounded by parents and not accessible. I walked out into the hall and approached mrs. Sumner and told her of the situation. She did not offer or make any effort to secure the files and stated "mr. Solz is handling that." Had she offered to take them and place them in a secure place, as she should have done when I approached her and asked her about it, none of this would have happened.

I assisted you and your administrative staff by securing those records and making sure you were in compliance with privacy laws. It should have been handled by your administrative staff but they refused.

In the future, rather than punishing me and my son by removing my opportunity to participate in his education, I would hope that you would train your staff on how to maintain privacy law compliance.

Thank you.

Sent from my iPhone



EXHIBIT

E

ALL-STATE LEGAL®



## Friday Folder-Note

**Solz, David** <SOLZD@leonschools.net>                                Mon, Oct 26, 2015 at 11:49 AM
To                                com>

I see from your e-mail we are not on the same page.  We discussed this issue together so that I could convey to you the schools concerns and we would be clear about  our expectations while on visitors are on campus.  I apologize that our perspective was not made clear to you.  I see great variance in your perspective and that of our staff that causes me concern about moving forward.   I believe we need to discuss the matter again prior to you visiting our campus unsupervised.  At this time, I must revoke your ability to visit campus unsupervised by an administrator until we are on the same page about removing teacher/student files without permission.  I listened to your perspective of the events during our last conference.  I shared with you the perspective of the school and the staff members involved.  You shared with me you were clear about the expectations for future visits and teacher/student files.  I noticed in your e-mail that our expectation and perspective were not clear enough.  Please, schedule a time to meet with me so we can discuss this matter again.  At this time I have to revoke your ability to visit campus without my authorization.

I will inform Ms. Bottini that I have had to change your visitation status since our previous e-mail.   You are always welcome to participate in your child's educational process.  Please, make use of a phone conference at any time or you may request a face-to-face conference with one our administrative staff and your child's teacher.

I apologize that I was not clear enough during our previous conference, and I am happy to make our expectations clear.

## David Solz, Principal

## Gilchrist Elementary School

